IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 18-CR-34 |
| | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | |
| | : | |
| IZMIR KOCH, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Government respectfully submits this memorandum in advance of the defendant's sentencing.

The defendant fractured a man's face because of the defendant's animus towards Jews and then lied about it to the FBI. As outlined in greater detail below, the defendant deserves a Guidelines sentence of between 51 and 63 months, consistent with the sentences other district courts have imposed under strikingly similar circumstances.

**BACKGROUND**

**I.    The Offense Conduct**

   A.    <u>The Night at Mirage</u>

On February 4, 2017, the defendant was socializing with a group of friends at the Mirage Restaurant at Harper's Point in Cincinnati, Ohio. *See* Trial Transcript ("Tr.") 283:1-7. Around midnight, the defendant stepped out of the restaurant with friends, and started yelling that he hated Jewish people, wanted to "slaughter" them, and demanded to know who present was a Jew. Tr. 41:10-11; 77:15-18; Tr. 135:19-20; 136:4-7.

Paul Marshall, who was also at the Mirage Restaurant that night, answered the defendant.

Tr. 45:6-8. Marshall—who is not Jewish—told the defendant he was, because Marshall's fiancée is Jewish. Tr. 78:2-3; 83:8-11. In response, the defendant ran up behind Marshall and punched him twice in the back of the head. Tr. 45:12-13; 78:3-4. Marshall fell to the ground, and the defendant and his friends continued the assault, kicking and punching Marshall while he lay in the parking lot. Tr. 45:12-17; 78:3-8. Marshall testified at trial that he saw the heel of a boot descending towards his eye, as he tried to protect his head. Tr. 78:6-9.

Marshall's fiancée Anna Kapitula tried to rescue him, but the men threw her to the ground "like a rag doll" while she screamed. Tr. 78:21-25; *see also* Tr. 136:9-13. Marshall's friend Igor Titov also attempted to protect Marshall, and pulled the defendant off of Marshall while the defendant screamed that he wanted to "slaughter, slice, and kill Jews." Presentence Investigation Report ("PSR") ¶ 10. Mikail Beshirov, an associate of the defendant, helped Marshall and Kapitula to Kapitula's car, instructing them to leave before they were killed. Tr. 79:1-10; *see also* 137:5-8. The defendant continued to run around the parking lot, screaming "If I had a knife, . . . I would cut a Jew." Tr. 46:20-24; *see also* Tr. 183:18 – 186:13. Throughout his verbal assault, the defendant used the derogatory Russian slur "zhid" to describe Jews – a word two separate Russian speakers described as equivalent to the n-word. Tr. 47:3-17; 67:24 – 68:1; 184:14 – 185:7.

As Kapitula sped away from the Mirage, Marshall rode in pain in the car, and was already showing external signs of injury, including a swollen eye and sore ribs. Tr. 79:19 – 80:6; 138:14-16.

Marshall went to the hospital the next morning, where he was diagnosed with a fracture of his orbital bone and rib contusions. Tr. 80:15-23; Gov't Ex. 5. He suffered severe headaches for a month after the event as a direct result of the injury to his eye. Tr. 82:11-15. Because of his injuries, he was unable to work and lost his job. Tr. 82:20-83:7.

2

B.      Statements to Law Enforcement

After the defendant was charged with a federal hate crime, and shortly in advance of trial, defense counsel contacted the Government and requested an "innocence proffer," for the defendant to come and speak to law enforcement about the events at the Mirage. Tr. 300:25 – 301:7. The Government agreed.

On October 18, 2018, the defendant, along with his counsel, came to the FBI offices in Cincinnati. Tr. 289:18 – 290:5. With the consent of both the defendant and defense counsel, an FBI agent administered a polygraph examination to the defendant with the assistance of a Russian interpreter. Tr. 275:11 – 276:1; PSR ¶ 20. In connection with the polygraph examination, the defendant signed a sworn statement about his participation in the assault at Mirage. PSR ¶ 19; Gov't Ex. 6. In that statement, the defendant said, among other things, that he witnessed a fight between Paul Marshall and Mikail Beshirov over Ms. Kapitula. *See* Gov't Ex. 6. According to the defendant, Marshall said, "I am Jewish. I can fuck anyone," which led to a two-punch fight between Marshall and Beshirov. *Id*. According to the defendant, he himself "never said anything bad about Jews that night." *Id*.

After the polygraph examination, FBI agents conducted an interview of the defendant in the presence of his attorney, two Russian interpreters (one provided by FBI and the other retained by the defendant), and the undersigned attorneys. Tr. 290:16 – 291:2. At the beginning of the interview, FBI agents warned the defendant that lying to federal agents was a crime. Tr. 291:3-8.

The defendant told the agents that he had gone to the Mirage with friends and family on February 4th. Tr. 291:22 – 292:4. He claimed that, during one of his smoke breaks, he saw Paul Marshall and Mikail Beshirov fighting. Tr. 292:9-13. According to the defendant, Beshirov punched Marshall, Marshall punched Beshirov back—"boom, boom; that's all"—and then a

3

group of bystanders attempted to break it up. Tr. 292:14-22. The defendant claimed that he tried as well to break up the fight, and was briefly knocked the ground during his efforts. Tr. 293:13-25. The defendant asserted that he was "a hundred percent confident" in his recollection of events. Tr. 293:10-12.

After the "innocence proffer," the Government sought and obtained a superseding indictment, adding a charge of false statements in violation of Title 18, United States Code, Section 1001 to the defendant's pending hate crime charge, in violation of Title 18, United States Code, Section 249(a)(1).

## II. The Defendant's Trial and Guidelines Range

On November 13, 2018, the defendant elected to proceed by bench trial before this Court. Trial lasted three days. On December 17, 2018, the Court adjudged the defendant guilty of Counts One and Two of the Superseding Indictment.

Probation has calculated the defendant's Guideline range as follows (see PSR ¶¶ 26 – 44):

Count One: 18 U.S.C. § 249 – Hate Crime

- The United States Sentencing Commission Guidelines Manual ("U.S.S.G."), effective Nov. 1, 2018, applies to this conduct.

- Pursuant to U.S.S.G. § 2H1.1(a)(1), the base offense level is the offense level from the offense guideline applicable to any underlying offense. The most analogous underlying offense guideline is U.S.S.G. § 2A2.2 for aggravated assault. Accordingly, the base offense level is 14.

- Pursuant to U.S.S.G. §2A2.2(b)(3)(B), because the victim sustained serious bodily injury, five levels are added.

- Pursuant to U.S.S.G § 3A1.1(a), because the defendant intentionally selected the victim as the object of the offense of conviction because of the actual or perceived religion of the victim, three levels are added.

- Pursuant to U.S.S.G. §3C1.1, because the defendant obstructed justice by making false statements to the FBI, two levels are added.

4

Count Two: 18 U.S.C. § 1001 – False Statements

- Probation found that the Count Two should be grouped with Count One because Count Two embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to Count One (see obstruction points above).

In accordance with the above, Probation calculated the total offense level at 24. PSR ¶ 41. Probation calculated the defendant's criminal history as I. *Id.* ¶ 47. The defendant's Guideline range then is 51 to 63 months' imprisonment. The Government agrees with Probation's Guidelines calculation.

## DISCUSSION

### III. The Defendant's Conduct Warrants a Guidelines Sentence

The factors that the Court must consider when fashioning a sentence include the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the defendant's offense, the promotion of respect for the law, the need for just punishment for the offense, and the need for adequate deterrence. *See* 18 U.S.C. § 3553(a)(2). All such considerations compel a sentence of incarceration for the defendant's crimes.

A. The Defendant's Hate Crime is Deplorable

The defendant's violent crime against someone who represented he was Jewish is a horrifying offense that warrants incarceration. The defendant, spewing hateful rhetoric about Jewish people, instigated conflict because he wanted to commit an act of violence against a member of the group he disdains. He screamed out that he hated Jews and wanted to "slaughter" them, and demanded to know, "Who is Jew?" to a crowd of people, hoping someone would challenge him and give him the opportunity to attack. Tr. 41:10-11; 77:15-18; Tr. 135:19-20; 136:4-7. When the victim answered that he was Jewish, the defendant wasted no time. He ran up, punched the victim in the back of the head, "dropp[ing]" the victim to the ground. Tr. 78:6. The victim "saw a heel coming at [his] face" as he lay on the pavement, while his fiancée

5

screamed, and the defendant and his friends continued their attack. Tr. 78:7. The victim curled into "a fetal position trying to protect [his] head." Tr. 78:9. The defendant did not relent in his attack—even as the victim's fiancée attempted to intervene—until he was physically pulled off of the victim. Another person picked the victim off the ground, telling him to escape "before they kill you." Tr. 78:11-12. And as the victim and his fiancée sped from the parking lot, the defendant continued to run after them, kicking the car, screaming about cutting the Jews.

From the defendant's assault, the victim suffered a fractured eye socket, bruised ribs, and chronic headaches that cost him his job. Tr. 82:7 – 83:7. He and his fiancée lived in fear after the attack, reluctant to seek justice for what happened to them that night because they were so afraid. Two years after the attack, the victim "still fears retaliation from the defendant and his associates," and has moved to a new home out of concern for his safety. PSR ¶ 23.

The persistent fear engendered by the defendant's hate-filled attack reverberated even beyond the victim. After the assault, members of local Jewish community organizations reached out to the FBI after the incident to urge investigation and justice. In one of the messages received by the FBI, an individual wrote that "[t]he entire Jewish Russian community is devastated." The message of hate that the defendant conveyed that night through his words and actions spread well beyond the confines of the Mirage parking lot to reach and terrorize its intended targets.

This exemplifies why hate crimes are so ruinous, why their effect is so insidious. Members of the targeted community have their sense of security and peace eroded, and suffer severe psychological effects, purely because of their identity. As the American Psychological Association recognizes, "[h]ate crimes send messages to members of the victim's group that they are unwelcome and unsafe in the community, victimizing the entire group and decreasing

6

feelings of safety and security."[1] "[H]ate crimes spread fear and anger throughout communities that impact upon people's actions and their perceptions of the criminal justice system. . . . Hate crimes, then, have the potential to cause injury and distress both at the individual and community level."[2] Long after the physical injuries may have healed, the psychological injuries and destabilization persists throughout the community.

The sheer viciousness of the defendant's crime cannot be overstated. The defendant felt justified in breaking a man's skull because the defendant believed that person was a member of a religion he disdains. The defendant viciously and relentlessly beat someone because of that person's purported faith. The defendant—someone who actively sought to become a citizen of the United States because he wanted a "better life with less prejudice," see PSR ¶¶ 51-52 — disrespected one of the fundamental tenets of freedom in this country in order to cause permanent psychological and physical harm towards a stranger. In so doing, the defendant terrorized an entire community. The nature of this offense, then, is among the most serious that the Court encounters, and warrants a significant sentence.

B. The Defendant Deliberately Lied to Law Enforcement

In an attempt to escape responsibility for his heinous hate crime, the defendant purposely and deliberately lied to law enforcement about his conduct. That is a separate, serious crime that warrants imprisonment.

It was the defendant who insisted on the "innocence proffer" where the defendant made his repeated false statements. Held on October 18, 2018—less than a month before the

---

[1] American Psychological Association, Public Interest Government Relations Office, "The Psychology of Hate Crimes," available at: https://www.apa.org/advocacy/civil-rights/hate-crimes.pdf.
[2] University of Sussex, "The Sussex Hate Crime Project Final Report," at 3 (Jan. 2018) available at: https://www.sussex.ac.uk/webteam/gateway/file.php?name=sussex-hate-crime-project-report.pdf&site=430.

trial date—the defendant wasted hours of time of FBI agents, FBI staff, DOJ attorneys, and defense witnesses by telling obvious falsehoods about his criminal conduct. As the result of his blatant false statements, the Government then had to expend time and resources seeking a superseding indictment, and prepare additional witnesses and exhibits for trial.

The defendant's purpose in repeatedly lying to the FBI was to thwart the investigation and impede the trial in a desperate attempt to avoid responsibility for his hate crime. Rather than accept responsibility for what he had done, the defendant hoped his false story would cause federal investigators to abandon the case against him. This willingness to abuse the resources of the federal government to perpetrate lies supports the need for a Guidelines sentence.

C. <u>The Defendant Shows No Remorse</u>

Consistent with his efforts to deceive law enforcement in order to escape responsibility, the defendant continues to show no remorse or even recognition of his crimes. Even now—after his conviction at trial—the defendant denies yelling anti-Semitic remarks, denies attacking the victim, denies lying to the FBI, and even denies that the victim and witnesses in this case experienced fear. Defendant's Objections to PSR ("Def. Obj.") at 1-2. Despite asserting that he "accept[s] full responsibility for [his actions]," he only states that he "understands the verdict." *Id*. at 2; PSR ¶ 26. He then has the gall to object to the calculation of his Guidelines range because he believes he is entitled to a two-point reduction for acceptance of responsibility. *See* Def. Obj. at 3.

Acceptance of responsibility requires "true remorse for specific criminal behavior[.]" *United States* v. *Morrison*, 983 F.2d 730, 735 (6th Cir. 1993). It is not, as here, a complete absence of remorse or even recognition of the crime. *See United States* v. *Mitchell*, 681 F.3d 867, 884 (6th Cir. 2012) (affirming district court's conclusion that the defendant's "continued efforts to deny his involvement demonstrated a failure to take responsibility for his crime and a

8

lack of remorse for the harm he had caused"). During his false statements to law enforcement, the trial, and even now in the process of sentencing, the defendant refuses to accept the truth. He will not admit that anyone that night made anti-Semitic comments. Instead, the defendant maintains the ridiculous claim that the victim was bragging about his sexual access based on his purported faith. Tr. 278:11-12 ("Paul said, 'I am Jewish. I can fuck anyone.'"). At trial, he described an improbable conflict between the victim and Mikail Beshirov, in an attempt to shift blame for the assault on the man who helped the victim and his fiancée escape that night. *See* Tr. 278:8-15; Tr. 292:12-17; *see also* Tr. 91:22-25 (testimony of victim that Mikail Beshirov helped him to the car). The defendant denies striking the victim, he denies participating in the assault, he even denies having any animus towards Jews. In his telling, he was just an innocent bystander, roped into this offense because of some nebulous conspiracy between the victims. *See, e.g.*, Tr. 392:14-17, 393:13-17. ("So why Izmir? What I submit to this Court, that Igor Titov, Anna, and Paul discussed this, what they were going to report to the police before the report was made because they're all friends. . . . And Titov and Anna and Paul had every right to be angry, and they wanted retribution. So they pull one guy in thinking that they were going to get the chain of everyone else. And they used a race card, right."). It is not simply that the defendant is minimizing his crimes – he made up and maintains a ridiculous story in a futile attempt to explain away his vicious conduct.

This complete lack of recognition or remorse, which evinces a lack of respect for the law, supports a Guidelines sentence.

### D. A Guidelines Sentence is Consistent with Similar Cases

In the defendant's objections to the PSR, the defendant proposes that probation with house arrest is the appropriate outcome for this case. *See* Def. Obj. at 5. Such a departure from the Guidelines range is not only unwarranted and unearned, but is also inconsistent with the

9

significant sentences of incarceration imposed in similar cases.

For example, in a recent case out of the Eighth Circuit, the district court sentenced a defendant to 120 months' imprisonment for his racially-motivated assault. *See United States* v. *Metcalf*, 881 F.3d 641, 642 (8th Cir. 2018). Defendant Metcalf was convicted after trial of violating 18 U.S.C. § 249(a)(1). *Id*. After harassing an African American man at a bar and starting a fight, Metcalf kicked and stomped the man's head, saying "die n-----." *Id*. at 643. The district court sentenced Metcalf to the statutory maximum. *Id*. at 642.

In a case out of the Fifth Circuit, the district court sentenced three defendants to terms of imprisonment after their racially-motivated assault. *See United States* v. *Cannon*, 750 F.3d 492, 497 (5th Cir. 2014). In *Cannon*, three men were convicted at trial of violating 18 U.S.C. § 249(a)(1) after they attached a black man at a bus stop. *Id*. The defendants called the victim the n-word, and then fought him, leaving him bloodied and bruised. *Id*. at 496. The district court sentenced the three men to terms of imprisonment of 30 months, 37 months, and 77 months, for their roles in the attack. *Id*. at 497.

In another case out of the Eighth Circuit, the district court sentenced a defendant to 135 months' imprisonment for his participation in a racially-motivated assault. *See United States* v. *Maybee*, 687 F.3d 1026, 1029 (8th Cir. 2012). Defendant Maybee was convicted after trial of violating 18 U.S.C. § 249(a)(1), after he and two others yelled racial epithets at five Mexican men, and then used their vehicle to strike the Mexican men's vehicle repeatedly until it crashed. *Id.* at 1029-30. The five victims sustained injuries in the crash, including fractured ribs and head injuries. *Id*. at 1029. The district court sentenced Maybee to 135 months' imprisonment, which was affirmed on appeal. *Id*. at 1033-34.

All of these cases were violent assaults similar to the violent assault committed by the defendant in this case. As this Court is well aware, one of the express goals of sentencing is to

"avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Following the defendant's recommendation and sentencing him to probation with house arrest for a violent, hate-based assault would create an unwarranted sentencing disparity. *See United States* v. *Swafford*, 639 F.3d 265, 270 (6th Cir. 2011) ("The point of the guidelines is to decrease sentencing disparities, an objective *furthered* by a within-guidelines sentence, as opposed to a sentence that varies above or below the advisory guidelines range. The very thing [the defendant] presumably wants—a below-guidelines sentence—is more likely to create disparities than eliminate them."). There is no reason for a variance here, and a Guidelines sentence is appropriate.

### IV. The Court Should Remand the Defendant at Sentencing

In the PSR, Probation submits that the defendant "appears to be an appropriate candidate for voluntary surrender." PSR at 34. The Government disagrees and respectfully requests that the Court remand the defendant at sentencing.

Pursuant to the Mandatory Detention Act, Title 18, United States Code, Section 3143(a)(2), a defendant convicted of a crime of violence must be detained pending sentencing unless *either* the Court finds there is a substantial likelihood that a motion for a new trial or acquittal will be granted *or* a Government attorney has recommended no imprisonment. 18 U.S.C. § 3143(a)(2)(A)(i)-(ii); *see also* 18 U.S.C. § 3142(f)(1)(A) (crime of violence). If the Court finds either of those conditions met, then the Court must find by clear and convincing evidence that the person is not likely to flee or pose a danger to the community before authorizing release. *Id.* § 3143(a)(2)(B). By the mercy of this Court, the defendant was permitted to remain on bail after the rendering of the verdict in this case.

Trial concluded on November 15, 2018. This Court rendered its verdict on December 17, 2018. Sentencing in this case is scheduled for June 20, 2019. If sentencing proceeds as

11

scheduled, the defendant will have had six months to get his affairs in order and prepare for a term of incarceration. The Government submits that there is no reason not to remand the defendant at his sentencing.

There are, however, compelling reasons that the defendant should not be permitted to surrender voluntarily. First, the defendant's objections to the PSR show that the defendant is seeking a non-custodial, probationary sentence – a sentence that would be an unprecedented and unjustified departure from the sentencing Guideline range. His request demonstrates that he has not come to terms with the appropriate consequences for his crimes. If this Court sentences this defendant to a term of incarceration, he will have a significant incentive to flee.

Second, the defendant has the means to flee, and Probation suggests both that he did not report accurate financial information during the PSR process and has access to a large amount of cash. PSR ¶ 64; *see also* PSR at 34 ("[I]t is recommended Koch be required to provide accurate financial information to the probation officer[.]"). Probation is correct, as the defendant's own statements demonstrate. For example, for the PSR, the defendant reported a salary of $5,000 a month, which works out to $60,000 annually. *See* PSR at 14. Yet in his signed, sworn statement to the FBI, he reported that he "made $87,000 as a salary last year." Gov't Ex. 6. And in his 2017 tax returns, which he provided to Probation, he reported a business income of $54,136. PSR ¶ 63. These are inexplicably large discrepancies in the defendant's salary, all coming from the defendant's own representations. These inconsistencies—along with disturbing details in the PSR like the defendant's "significant gambling losses and winnings" and regular gambling habit that he somehow conceals from his wife—support Probation's conclusion that the defendant has not been forthcoming with his financial information. Such deception harms the integrity of the sentencing process and deprives the Court of necessary information. *See United States* v. *Manning*, 526 F.3d 611, 620-21 (10th Cir. 2008) (noting that accurate information about a

defendant's resources in a PSR "is critical to the final judicial decision").  This alone suggests that the defendant will not respect a Court order to self-report and should be remanded at sentencing.

But in addition to not reporting his finances accurately, he also has been caught personally transporting large amounts of cash overseas.  *See* PSR ¶ 64 ("For example, in 2016, the defendant was stopped at the Chicago O'Hare Airport with $108,000 in cash. . . . The defendant stated he was transporting the money back and forth to Russia to purchase cars.").  According to the defendant's signed, sworn statement to the FBI "[i]t is typical to travel with large sums of cash to Russia."  Gov't Ex. 6.  This suggests that the defendant has access to large amounts of cash both here and abroad, which would facilitate international flight in advance of his self-report date.

Notably, the defendant has already demonstrated disrespect for court orders; he committed this hate crime while out on state bond for another violent crime.  PSR ¶ 44.  The defendant was eventually convicted of felonious assault in the state, for a crime Probation calls "eerily similar to the instant offense."  PSR at 34.  The defendant participated in the group beating of a single victim, and was captured on video camera kicking the victim while he was on the ground in a parking lot.  *Id.*; *see* PSR ¶ 44.  The defendant has already starkly displayed his lack of respect for orders from the court.

In the time since the trial, the defendant has had ample opportunity to prepare to serve his time for his serious, violent crime.  The defendant poses a serious risk of flight and the Government submits he should be remanded at his sentencing.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that a Guidelines sentence in this case is appropriate, and the defendant should be remanded at sentencing.

Dated:    Cincinnati, Ohio
               May 20, 2019

                                          Respectfully submitted,

                                          BENJAMIN C. GLASSMAN
                                          United States Attorney

                                          s/*Megan Gaffney*
                                          MEGAN GAFFNEY
                                          Assistant United States Attorney
                                          221 East Fourth Street, Suite 400
                                          Cincinnati, Ohio 45202
                                          (513) 684-3711

                                          DANA MULHAUSER
                                          Trial Attorney
                                          U.S. Department of Justice
                                          Civil Rights Division
                                          950 Pennsylvania Avenue, NW
                                          Washington, DC  20530
                                          (202) 305-0007

## **CERTIFICATE OF SERVICE**

The undersigned attorney, duly admitted to represent the United States before this Court, hereby certifies that on the below date, she caused the Government's Sentencing Memorandum be served on counsel for the defendant electronically.

Dated: Cincinnati, Ohio
May 20, 2019

Respectfully submitted,

/s/ Kelly Rossi for Megan Gaffney
Megan Gaffney
Assistant United States Attorney
Kelly Rossi
Special Assistant United States Attorney